Receipt number AUSFCC-11280094

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

CLYDE B. SHERPELL III,

    Plaintiff,

    v.

UNITED STATES,

    Defendant.

No.: **26-789 C**

**COMPLAINT FOR CANCELATION OF DEBT ILLEGALLY IMPOSED,
BACK PAY, REINSTATEMENT, RECORDS CORRECTION
AND OTHER DUE AND PROPER COLLATERAL RELIEF
IN THE CASE OF UNLAWFUL DISCHARGE FROM THE U.S. NAVAL ACADEMY**

Plaintiff, CLYDE B. SHERPELL III, by and through undersigned counsel, brings this action against the Defendant United States, seeking recovery of monies Defendant intends illegally to exact, payment of back pay and allowances, reinstatement as a midshipman at the U.S. Naval Academy, correction of military service records, and all due and proper collateral relief otherwise necessary to redress for the plain legal error committed thereby in the course of its adverse administrative action against him, which was also arbitrary and capricious, unsupported by substantial evidence, and contrary to the Constitution, applicable law, regulation, mandatory published procedure, or standard agency practice, and alleges as follows:

**PARTIES**

1. The Plaintiff, Clyde B. Sherpell III, is a former Midshipman First Class at the United States Naval Academy appointed to the Class of 2026 and a United States citizen. He is referred to interchangeably herein as "Mr. Sherpell" or "Plaintiff."

2. The Defendant is the United States of America, acting by and through the Department of the Navy ("DON"), a component of the Department of Defense ("DOD") pursuant to 10 U.S.C. §

1

111(b)(7), and an agency of the United States government pursuant to 5 U.S.C. §§ 101, 102, and 105. This Complaint refers interchangeably to the Defendant as the "United States," "Defendant," "the Navy," "the Department of the Navy," or the "DON," and also refers where appropriate to the Acting Secretary of the Navy ("SECNAV"), the Acting Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN(M&RA)"), and the Defense Finance and Accounting Service ("DFAS") as individual agents of the DOD and/or DON.

## NATURE OF THE ACTION

3.  This military-pay action is for reinstatement, back pay, records correction, and all other due and proper collateral relief. It seeks a judgment against the Defendant for money in the form of pay to which Plaintiff is entitled and which Plaintiff would have received but for his unlawful discharge, contrary to the Constitution, statute, and DOD and DON regulations and practice, along with recovery of any and all payments Plaintiff has made to date to DFAS for DON's monetary recoupment of the cost of Plaintiff's Naval Academy education as well as all other relief incident of and collateral to that judgment in order to provide an entire remedy and complete the relief due to Plaintiff as contemplated by 28 U.S.C. § 1491(a)(2) (2006).

4.  At its core, this case concerns the fundamental question as to whether the First Amendment to the U.S. Constitution allows the military to punish servicemembers for what they may "think," as expressed in sometimes provocative rhetoric in lively discussions about culture or politics within the confines of a college dormitory room, as opposed to how they actually conduct themselves in the treatment of, and respect shown, to others. In this case, there exists not a shred of evidence that Plaintiff *ever* treated any member of any protected class, whether subordinate, peer, or superior, with any lack of dignity or respect, let alone a lack of dignity or respect warranting the draconian sanction of disenrollment form the Naval Academy and discharge from the Naval Service. As Jane Austen famously said in *Sense and Sensibility*, "It is not what we say or feel that

2

makes us what we are. It is what we do. Or fail to do." Irrespective of what Petitioner may or may not have thought as expressed to his roommate, Petitioner never once failed to treat every man and woman at the Naval Academy with the dignity and respect expected of every future Navy or Marine officer, as evidenced by the full Administrative Record and, among other things, the character letters it includes.

5. This case raises the specter of thought policing in the extreme, a concept anathema to our Constitution. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). In this case, one person, and one person only, a white, male, heterosexual American-born citizen who was not a member of any protected class and about whom the vast majority of the ideas at issue in this case had nothing to do, found those ideas sufficiently offensive as to constitute "discriminatory harassment" under the Navy Harassment Prevention and Military Equal Opportunity Program, OPNAVINST 5354.1H (the "CMEO Instruction"). But neither the facts nor the law begin to support the administrative conduct charges on which the purported violation of that Instruction were based, charges that were unlawfully multiplied and misapplied in the Naval Academy's zeal to make an unjust example of a Black midshipman, Mr. Sherpell, who speaks his mind and sometimes falls back on provocative language to do so. Moreover, Plaintiff was never given fair notice of those charges, nor was he advised of his rights to remain silent and to consult with counsel with respect to each of them.

6. But perhaps worst of all, in an instance of supreme irony, one Naval Academy senior enlisted leader found it necessary to confront Plaintiff at his conduct adjudication before the Commandant of Midshipmen with the image of James Byrd, Jr., a Black man who was chained to the back of a pickup truck and dragged to death in Jasper, Texas in 1998. The enlisted leader's invocation of that event was a patently racist attempt to compare Plaintiff's character to those of the

white men who tortured and killed James Byrd. The irreparable taint that statement imparted to the proceedings only served to underscore the hypocrisy that led to Plaintiff's separation and discharge.

## PRELIMINARY STATEMENT

7. Plaintiff's wrongful disenrollment from the Naval Academy and discharge from the Navy could only have been predicated on two bases, both of which purport to constitute "unsatisfactory conduct" under the Academy's *Administrative Performance and Conduct System* (COMDTMIDNINST 1610.2M) (the "Conduct Manual:" 1) a determination of guilt in the commission of three or more *separate* "Major-level" offenses or 2) a determination of guilt in commission of a separation ("SEPP") level offense. As set forth below, both such bases suffer from fatal factual, legal, and procedural flaws that render the finding of "unsatisfactory conduct" utterly untenable and warrant Plaintiff's reinstatement as a midshipman, payment of all backpay and allowance, correction of his military records, and all appropriate collateral relief.

8. As further set forth below, the administrative conduct discharge justification is marked by numerous additional procedural failures, abuses, circumventions, and missteps.

9. Each of these evidentiary insufficiencies, material violations of DON and Naval Academy Instructions, deprivations of procedural due process, and arbitrary and capricious agency actions are pleaded in the eleven causes of action below and warrant the relief Plaintiff respectfully requests.

## JURISDICTION AND VENUE UNDER TUCKER AND MILITARY PAY ACTS

10. Jurisdiction is proper pursuant to 28 U.S.C. § 1491(a)(1) (2006), because this action is a claim against the United States for the payment of money, founded upon an Act of Congress, namely, inter alia, 37 U.S.C. §§ 204(a)(1), 402(a)(1), and 403(a)(1) (2006), which mandate respectively the payment to a member of a uniformed service who is on active duty the basic pay,

4

basic allowance for subsistence, and basic allowance for housing of the pay grade to which he is assigned, and it is herein alleged that Plaintiff, who was a member of a uniformed service pursuant to 37 U.S.C. § 101(3) (2006), remains entitled to such pay owing to the fact that his involuntary separation from the Navy was effected on the basis of plain legal errors, or was otherwise arbitrary and capricious, unsupported by substantial evidence, or contrary to the Constitution, statute, regulation, mandatory published procedure, of DON agency practice, and are therefore void or voidable, and that Plaintiff would have received such pay but for the unlawful discharge. *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc). Jurisdiction is also proper pursuant to these same statutes because the DON wrongfully assessed monetary recoupment of the cost of Plaintiff's education against him, in response to which Plaintiff has been demanded to pay, to the U.S. Treasury through DFAS, the full amount allegedly due and owing.

11.  Venue is proper pursuant to 28 U.S.C. §§ 1346(a)(2) and 1491(a)(1), which situate claims against the United States exceeding $10,000 exclusively in this Court, because the money damages sought herein exceed that amount.

## TIMELINESS

12.  This Complaint is timely, pursuant to 28 U.S.C. § 2501 and RCFC 6(a)(1)(A), because it has been filed within six years of the date of the cut-off of Plaintiff's Naval Academy pay and allowances, when the cause of action stated herein accrued.

## BASIS OF CLAIM FOR RELIEF

13.  This Complaint alleges facts that entitle Plaintiff to a legal remedy, see *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002), insofar as it presents the Court with justiciable allegations of error that are fundamental, prejudicial, or not subject to harmless-error review.

14. The complaint presents the Court with a justiciable controversy because it requests that the Court review the actions of a federal agency for 1) plain legal error, *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) (citations omitted); *Strickland v. United States*, 69 Fed. Cl. 684, 699, 705–6 (2006); *Bond v. United States*, 47 Fed. Cl. 641, 662–63 (2000); 2) compliance with the Constitution, applicable statutes, regulations, or mandatory published procedures, *Fisher v. United States*, 402 F.3d 1167, 1177 (2005) (citations omitted); *Sargisson v. United States*, 913 F. 2d 918, 921 (1990); 3) substantial evidence in support of agency action, *Peoples v. United States*, 87 Fed. Cl. 553, 560 (2009); *Jordan v. United States*, 205 Ct. Cl. 65, 73 (1974); 4) whether agency action was based upon an improper construction of the Constitution, statutes, or regulations, *Lewis v. United States*, 458 F.3d 1372, 1378 (Fed. Cir. 2006), or whether a subordinate agency official, contrary to the Constitution, statute, or regulation, or in a manner that was otherwise arbitrary and capricious, unsupported by substantial evidence, or contrary to DON agency practice, derailed Plaintiff's enrollment at the Naval Academy, *Dysart v. United States*, 369 F. 3d 1303, 1316 (Fed. Cir. 2004); 5) whether the exercise of agency discretion violated the Constitution, *Holley v. United States*, 124 F. 3d 1462, 1466–67 (Fed. Cir. 1997); and 6) whether agency action was an unexplained or unreasonable departure from standard agency practice, *Tung Mung Dec. Co. v. United States*, 354 F.3d 1371, 1379 (Fed. Cir. 2004); *Towne v. United States*, 106 Fed. Cl. 704, 710 (2012).

15. The Complaint does not request that the Court evaluate the substantive merits of any unreviewable decision firmly entrusted to the discretion of the Defendant, but merely seeks review of whether Defendant's discretionary acts were supported by such relevant evidence as a reasonable mind might accept as adequate to support the findings and conclusions upon which those acts were based, *Kelly v. United States*, 826 F.2d 1049, 1053 (Fed. Cir. 1987); *Joslyn v. United States*, 90 Fed. Cl. 161, 179–180 (2009), or were consistent with controlling provisions of

the Constitution, statutes, regulations, and mandatory published procedure. *See*, *e.g.*, *Lewis*, 458 F.3d at 1377–78; *Roth v. United States*, 378 F.3d 1371, 1386 (Fed. Cir. 2004); *Holley*, 124 F. 3d at 1468; *Finkelstein v. United States*, 29 Fed. Cl. 611, 616 (1993).

16. This Complaint, additionally, alleges errors that are either 1) fundamental, *Porter v. United States*, 163 F.3d 1304, 1319 (Fed. Cir. 1998); 2) prejudicial, either because of the substantial nexus between the complained-of error and the outcome of the relevant agency proceeding, *Lindsay*, 295 F.3d at 1259; *Hary v. United States*, 223 Ct. Cl. 10, 15 (1980); *McCarron v. United States*, 84 Fed. Cl. 616, 621 (2008), or because a reviewing court cannot say with confidence that the agency would have reached the same decision in the absence of the error, *In re Chapman and King*, 595 F.3d 1330, 1339–40 (Fed. Cir. 2010); *Campbell v. MSPB*, 27 F.3d 1560, 1570 (Fed. Cir. 1994); or 3) not subject to harmless-error review, because the effect of the alleged error upon the outcome of the agency proceeding cannot be quantified without an impermissible approximation of agency discretion by the Court's determination, *United States v. Wagner*, 365 F.3d 1358, 1365 (Fed. Cir. 2004).

## PROCEDURAL POSTURE

17. Plaintiff has not applied for relief to the Board for Correction of Naval Records ("the Board"). Because recourse to the Board is permissive, not mandatory, and is therefore not required as a matter of exhausting administrative remedies, Plaintiff submits this Complaint as an original action for the Court's judgment in the first instance. *See Martinez*, 333 F.3d at 1304.

## FACTS ALLEGED

18. Clyde B. Sherpell III is 22 years old and hails from Prosper, Texas.

19. Mr. Sherpell attended the Coram Deo Academy in Plano, Texas, a private Christian high school. There he repeatedly lettered in football, basketball, and baseball. He graduated *magna*

*cum laude*, was selected for Texas Boys' State, and was an Eagle Scout. He received nominations to the Naval Academy from his congressman and from the Academy itself.

20. One of Mr. Sherpell's uncles and one of his cousins both served in the U.S. Marine Corps. Mr. Sherpell's sister, JeaShé, is currently a rising first class (senior) midshipman at the Naval Academy.

21. On June 20, 2022, Plaintiff was inducted into the Naval Academy, the only school to which he applied, given his strong desire to serve as a United States Marine.

22. Upon his induction, Plaintiff became a member of 14th Company. Two of his Plebe company-mates were MIDN Nicolas Krause and MIDN Jack Teske.

23. Plebe Summer is an intense period of military indoctrination marked by constant training and other evolutions.

24. During Plebe Summer, the Plebes of 14th Company quickly learned that MIDN Krause, a white American male, was Muslim, because his required periods of daily prayer, which the Naval Academy accommodated, caused him to skip or be absent each day for various training periods and evolutions.

25. As is typical of the wolfpack culture of the Naval Academy, MIDN Kraus's absences did not go unnoticed by Plaintiff's company-mates. On one occasion, one such Plebe company-mate (not Plaintiff), cracked to MIDN Krause, in front of the group, "Oh really, Krause, you have to go pray to the god of convenience?"

26. As Plebe Summer wore on, MIDN Krause became more of a loner, and his company-mates' gripes about his missing evolutions continued.

27.  As the academic year began, MIDN Krause's roommate complained to the 14th Company chain of command that MIDN Krause was continuing to skip or avoid mandatory military evolutions.

28.  At no time did MIDN Krause complain to anyone that he was being unfairly treated on the basis of his religious practices.

29.  By the end of Plebe Year, because of MIDN Krause's self-inflicted isolation from his Plebe company-mates, combined with physical injury that precluded his participation in the two most important events of the end of Plebe Year – Sea Trials and climbing the Herndon monument – he had failed to establish meaningful bonds with any of his Plebe company-mates.

30.  Following summer training in 2023, Plaintiff wound up being assigned as roommates with MIDN Krause and MIDN Teske. The three remained roommates throughout their entire third-class ("Youngster" or sophomore) year (August 2023 to May 2024).

31.  The three soon began engaging in a seemingly endless series of discussions and debates, almost entirely within the confines of their room in Bancroft Hall, over some of the most pressing and controversial issues of the day.

32.  MIDN Krause actively participated in these discussions and was not shy about expressing his views.

33.  For example, the 2023-2024 Academic Year was the year the Department of Defense, including the Naval Academy, began renaming buildings that had borne the names of Confederate soldiers and statesmen. After the three roommates returned to their room following a Forrestal Lecture concerning the renaming efforts, MIDN Krause remarked to Plaintiff that Plaintiff, as a Black man, must be proud of "how far we've come" and that the renaming must be a "monumental event" for Plaintiff.

9

34.   In response, Plaintiff asked MIDN Krause, "Why are you only saying this to me?" Plaintiff went on to express his overall sentiment that the renaming did not advance the ball for him personally and that what he cared about and focused on was the future, not the past.

35.   A second example of MIDN Krause's uncabined willingness to express his political views was his posting of a pro-Hamas message in Instagram towards the end of Youngster (sophomore) Year, the year Plaintiff, MIDN Krause, and MIDN Teske roomed together. One of the company's midshipmen leadership saw the post and raised his concerns with the 23rd Company Officer.

36.   The vastly differing views of the three roommates notwithstanding, the discussions were typically civil and non-confrontational. As just one example, the three spent two hours one Friday in their room discussing the Israeli/Palestinian conflict. In any such conversation, MIDN Krause made clear that the State of Israel was on the wrong side of the argument.

37.   Unbeknownst to Plaintiff or to MIDN Teske, MIDN Krause was keeping a "log" of statements made by Plaintiff in the course of these conversations, conversations that took place over the more than seven months the three spent together as roommates (although none of the log's entries included dates or times).

38.   At no time throughout the course of these discussions did MIDN Krause ever say to Plaintiff that Plaintiff's views or statements were racist, sexist, offensive or made MIDN Krause feel uncomfortable. To the contrary, MIDN Krause would retort with, "I don't know how you can take that position." But he never told Plaintiff to stop or to modulate the level of his rhetoric.

39.   Plaintiff's, MIDN Krause's, and MIDN Teske's relationship as roommates ended at the end of the academic year in May 2024.

40.  That summer, MIDN Teske advised Plaintiff that MIDN Krause had been keeping a log of certain statements Plaintiff had allegedly made in their room-bound discussions over the course of the previous academic year.

41.  Plaintiff was not contacted or approached by MIDN Krause at any time over the summer or into the beginning of the 2024-2025 academic year.

42.  In or around mid-October 2024, MIDN Teske and MIDN Krause had dinner in Bowie, Maryland. At that dinner, MIDN Krause told MIDN Teske that he intended to lodge a complaint under the Navy's Command Managed Equal Opportunity ("CMEO") Program based on the statements MIDN Krause had recorded in his log.

43.  MIDN Teske relayed that information to Plaintiff and suggested that the three meet to discuss the situation.

44.  The news stunned Plaintiff, given the extent to which the three roommates had come together and supported one another during their time together with respect to three emotionally-charged events: a) the death of MIDN Teske's grandmother, 2) the death of CAPT Miguel Nava, USMC, in a helicopter crash, who had lived in the same room as the three while a midshipman, and 3) MIDN Krause's break-up with his long-time girlfriend in the Spring of 2024.

45.  About a week later, Plaintiff approached MIDN Krause and told him that Plaintiff was more than willing to meet with him to discuss whatever MIDN Krause wanted to talk about. MIDN Teske was present for the last two minutes of the conversation. Cognizant of his ultimate timeline to commissioning, Plaintiff self-referred to the Midshipman Development Center to maximize his access to the best treatment possible as immediately as possible to best prepare him for the demands of commissioning.

46.  The three met in one of the Academy's academic buildings on October 31, 2024. MIDN Krause produced a type-written paper containing 24 "quotes," none of them reflecting context, dates, or times, that Plaintiff had purportedly made in the room-bound discussions over the course of the 2023-2024 academic year.

47.  It quickly became apparent to Plaintiff that MIDN Krause wanted Plaintiff to admit to what a bad person he was and to beg for MIDN Krause's forgiveness. MIDN Krause opined that the statements reflected Plaintiff's true character, despite the fact that Plaintiff had not made any of the alleged statements to any other person or outside the confines of their room. MIDN Krause further opined that he could not let Petitioner graduate if he "was thinking those kinds of things."

48.  For his part, Plaintiff disputed the vast majority of the statements on the "log," discussed how other of the statements were taken completely out of context, and pointed out that the purpose of the statements was to get his roommates thinking and not simply reciting their own long-held beliefs. He asked MIDN Krause about the dates or times of their seven months together Plaintiff had made each of the statements, but MIDN Krause could offer no specifics.

49.  MIDN Krause then indicated that he felt better, would end the matter then and there, and would not file a CMEO complaint. Plaintiff hugged MIDN Krause to signal "this is where it ends."

50.  But that was not where it ended. Six weeks later, on or about December 4, 2024, Plaintiff received a notification through the Midshipman Information System ("MIDS") that he had been put into the Administrative Conduct System, but the notification did not specify the charge.

51.  Plaintiff then went to his company Senior Enlisted Leader ("SEL") about the charge, and the SEL told him that the charge was "harassment of a non-sexual nature."

52.  Plaintiff next went to see MIDN Krause, who told Plaintiff that he had, despite his prior representation that he would not do so, submitted an informal CMEO complaint against Plaintiff, alleging discriminatory harassment as that term is defined in the CMEO Instruction. The apparent date of the informal complaint was December 6, 2024, which post-dates the MIDS notification Plaintiff received by two days.

53.  The Deputy Commandant of Midshipmen elevated the complaint to a formal complaint that same day, December 6, 2024, and directed that the complaint be investigated by a Preliminary Inquiry Officer ("PIO").

54.  On December 9, 2024, HMC Sharon Barker was assigned as the PIO.

55.  On December 10, 2024, MIDN Krause signed a formal CMEO complaint using the form NAVPERS 5354/2. The PIO interviewed MIDN Krause and MIDN Teske that same day, initiating the 30-day investigation completion requirement set forth in the CMEO Instruction.

56.  On December 12, 2024, Plaintiff signed a Suspect's Rights Acknowledgement/Statement as to a potential violation of the Academy's Administrative Conduct System: 04.10 – Harassment of a Non-Sexual Nature, which carried a "Major" offense classification. This would be the only notice of any potential speech-related conduct charge Plaintiff would receive prior to his adjudication before the Deputy Commandant on May 7, 2025.

57.  The PIO then proceeded to interview Plaintiff.

58.  On February 10, 2025, more than two months after MIDN Krause had submitted his informal CMEO complaint, HMC Barker was replaced as the PIO by TMCS Jesse Davis due to a conflict of interest.

59. The new PIO re-interviewed Plaintiff, MIDN Krause, and MIDN Teske either the next day, February 11, 2025, or February 21, 2025. The Preliminary Inquiry Report ("PIR") submitted by TMCS Davis on March 3, 2025 contains a list of enclosures that identify the interviews as having taken place on February 11, but the interview memoranda themselves reflect interview dates of February 21.

60. There is no evidence in the administrative record that Plaintiff was provided with a Suspect's Rights Acknowledgement/Statement prior to that interview.

61. The new PIO interviewed MIDN Teske again on February 17, 2025.

62. On or about February 22, 2025, Plaintiff brought a civilian female to his room in Bancroft Hall. Plaintiff's roommate at that time reported the incident, and Plaintiff was charged with two violations under the Administrative Conduct System: 04.24 Sexual activity in an unauthorized location (Major), and 04.12 Introduction of, or failure to remove, unauthorized person from Bancroft or King Hall (Minor).

63. The PIO assigned to the case, QMC (SW) James M. Benson, did not complete his investigation of the alleged sex-in-the-Hall incident until April 15, 2025.

64. PIO TMCS Davis interviewed Plaintiff on March 3, 2025, the third time Plaintiff was interviewed concerning the CMEO complaint. There is no evidence in the administrative record that Plaintiff was provided with a Suspect's Rights Acknowledgement/Statement prior to that interview.

65. PIO TMCS Davis issued his Preliminary Inquiry Report the same day, March 3, 2025, recommending that the formal CMEO complaint be substantiated in accordance with the CMEO Instruction and then referred to the Administrative Conduct System for "at a minimum, harassment, violation of a Navy regulation, and conduct unbecoming."

14

66. On March 12, 2025, two members of the Academy's staff purported to conduct a sufficiency review of the CMEO complaint: the Command Climate Specialist ("CCS") and the Commandant's Assistant Legal Advisor.

67. On March 13, the Commandant of Midshipmen completed the sufficiency review and referred the matter to the Administrative Conduct System, directing that, in addition to the 04.10 charge of which Plaintiff had previously been given formal notice, that other potential conduct charges should include a) 02.09 Failure to Use Good Judgment (Minor), b) 04.21 Violation of the Uniform Code of Military Justice, Article 92, Failure to Obey and Order or Regulation (SEPP), c) 04.21 Violation of Navy Regulations, SECNAV and OPNAV Instructions, General Orders, federal, state, or local laws (Major), and d) 04.23 Conduct unbecoming a midshipman with no external (no non-USNA) awareness (Major).

68. Neither the Deputy Commandant nor anyone on his staff advised Plaintiff of the final outcome of the CMEO investigation, nor did they advise Plaintiff that he had the right to appeal the determination and, were he to decide to appeal, would have 30 days to do so.

69. The preliminary inquiry following the referral of the CMEO complaint to the Administrative Conduct System was assigned to QMC (SW) James M. Benson.

70. QMC Benson conducted no further investigation of the CMEO complaint. He relied instead on the PIR submitted by TMCS Davis on March 3, 2025. Thus, QMC Benson never gave fair notice to Plaintiff of the serious, additional charges he was now facing with respect to the CMEO complaint and never advised him of his rights as to those charges.

71. On March 21, 2025, QMC Benson, who was also the PIO investigating the sex-in-the-Hall allegation, had Plaintiff sign Suspect's Rights Acknowledgement/Statement that disclosed the 04.24 charge (Major – Sexual activity in an unauthorized location), but not the 04.12 charge (Minor

- Introduction of, or failure to remove, unauthorized person from Bancroft or King Hall). Plaintiff declined to make a statement.

72. Because both investigations were assigned to the same PIO, adjudication of the CMEO-related charges was further delayed by the pendency of the PIO's investigation into the sex-in-the-Hall allegations.

73. The woman Plaintiff brought into his room the night of February 22, 2025 was never identified and never interviewed.

74. The only eyewitness to those events, Plaintiff's roommate, told the PIO that while he did not actually witness Plaintiff having sex with the woman, he suspected as much because of the sounds they were making.

75. On April 15, 2025, QMC Benson submitted a combined PIR for both the CMEO complaint allegations and the sex-in-the-Hall allegations. He opined on the sufficiency of the evidence as to each element of the harassment-related and conduct unbecoming charges despite the fact that he had absolutely no personal knowledge as to any aspect of the investigation of those charges.

76. At approximately 8 p.m. on the day before his adjudication before the Deputy Commandant (which was less than 24 hours before the adjudication), Plaintiff and his midshipman chain of command were brought into the Commandant's conference room, where the Brigade Sergeant Major showed those assembled MIDN Krause's "quote log" and interview summaries from the CMEO and sex-in-the hall investigations.  Plaintiff was never, however, provided with a copy of the PIR prior to his adjudication before the Deputy Commandant.

77. On May 7, 2025 the Deputy Commandant adjudicated both the CMEO charges and the sex-in-the-Hall charges.

78. The Deputy Commandant found Plaintiff guilty of all charges and awarded Plaintiff 60 days restriction, 6 months loss of privileges, 80 demerits, and forwarded Plaintiff to the Commandant for separation.

79. The adjudication before the Commandant took place on May 20, 2025.

80. During the adjudication, the Brigade Master Chief ("BMC"), asked Plaintiff where he was from.

81. When Plaintiff replied that he was from Texas, the BMC asked Plaintiff if he had ever heard of Jasper, Texas. When Plaintiff said that he had not, the BMC suggested that Plaintiff "look it up."

82. As acknowledged by the Command in its notes of the Commandant's adjudication, the BMC was referring to the murder of James Byrd, Jr. in 1998, who was chained to the back of a pickup truck and dragged to death in Jasper, Texas.

83. When Plaintiff pointed out during the investigation that he had already undertaken self-remediation with the Midshipman Development Center ("MDC"), Dr. Marti Kwon, the Academy's CMEO representative, and another faculty member, the BMC stated, "That just proves that you are guilty."

84. Plaintiff was interviewed by the Superintendent on July 31, 2025.

85. By Memorandum to the Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN(M&RA)") dated August 7, 2025 (the "Superintendent's Memorandum Report"), and pursuant to 10 U.S.C. § 8462, the Superintendent recommended that Plaintiff be disenrolled from the Naval Academy, that he fulfill his service obligation through monetary recoupment in the

amount of $179,459.06, and that he be given a general (under honorable conditions) characterization of service.

86.  The Superintendent's Memorandum Report cited both the CMEO complaint and the sex-in-the-Hall allegations as grounds for her separation recommendation.

87.  On or about September 2, Plaintiff submitted a response to the Superintendent's Memorandum Report in accordance with 10 U.S.C. § 8462(b). The submission identified the vast majority of the procedural and evidentiary infirmities set forth in this Complaint.

88.  By Memorandum dated November 20, 2025, ASN(M&RA) disenrolled Plaintiff from the U.S. Naval Academy and ordered that he fulfill his obligation for the educational benefits he received through monetary recoupment in the amount of $179,459.06 and be given a general (under honorable conditions) characterization of service. The Memorandum provided no reasons or bases for those final agency actions. Nor did it reflect, as required by applicable regulations and instructions, a determination as to whether Plaintiff was unsuited to satisfy his service obligation through enlisted service rather than monetary recoupment.

89.  On December 5, 2025, the Naval Academy placed Plaintiff on administrative leave pending his discharge from the military and immediately cut off his pay and allowances.

90.  Plaintiff's discharge from the military was consummated on or about December 17, 2025 with issuance of certificate of discharge, Form DD 214.

91.  By letter dated January 23, 2026, DFAS notified Plaintiff of his recoupment obligation in the amount of $180,218.21 and advised Plaintiff that that the entire amount was immediately due and payable. DFAS gave Plaintiff no option to make monthly payments.

Wherefore, on the basis of the foregoing and the other facts and claims herein alleged, Plaintiff prays the Court to award him judgment against the Defendant in an amount exceeding ten thousand dollars ($10,000.00) and grant the relief herein requested on the following Counts as hereinafter asserted and detailed:

**COUNT I**
**SEPARATION VOID GIVEN THE INSUFFICIENCY OF THE EVIDENCE SUPPORTING THE HARASSMENT AND CONDUCT UNBECOMING CHARGES.**

92.  Plaintiff realleges paragraphs 1–91 as if fully set forth here.

93.  OPNAVINST 5354.1H requires that harassment be proven by a preponderance of the evidence. MIDN Krause listed 24 statements; Plaintiff admitted to three statements to MIDN Krause (while making clear that MIDN Krause took the statements out of context), and the only other witness to the statements, MIDN Teske, only recalled four such statements himself.

94.  MIDN Teske further stated in one or more of his interviews that Plaintiff never intended to denigrate or harass anyone, that MIDN Krause had taken Plaintiff's statements out of context and that, at best, Plaintiff was simply, in the course of one or more "heated conversations," "trying to get a rise out of MIDN Krause by making controversial statements regarding social or political issues."

95.  Despite the absolute dearth of evidence corroborating the vast majority MIDN Krause's self-serving allegations, the PIO who issued the final PIR on the CMEO charges, QMC Benson, and who had no first-hand knowledge of any of the evidence gathered by two other PIOs, nonetheless opined that it was "likely" that Plaintiff had made all 24 statements. That opinion falls outside of the duties and responsibilities of any PIO under the Conduct Manual or the JAGMAN and does not constitute evidence of anything.

19

96. As for the sex-in-the-Hall charge, there is absolutely no evidence that Plaintiff and the civilian female did, in fact, engage in sexual intercourse in Bancroft Hall.

97. "[J]ustice requires that every element of a charged offense must be proven in order to sustain a punitive action based on that charge." Memorandum dated 10 September 2002 by Joseph G. Lynch, Navy Assistant General Counsel (Manpower and Reserve Affairs). The Naval Academy utterly failed to do so, and thus any separation justification premised on a finding of guilt as to these SEPP-level and Major-level offense is null and void; specifically, the commission of three Major-level offenses over the course of a Naval Academy career or the alleged violation of an improper SEPP-level offense (see Count IV below).

## COUNT II
### SEPARATION VOID GIVEN THAT PLAINTIFF'S CONDUCT DID NOT CONSTITUTE "DISCRIMINATORY HARASSMENT" AS A MATTER OF LONGSTANDING FEDERAL CASE LAW.

98. Plaintiff realleges paragraphs 1–97 as if fully set forth here.

99. The informal CMEO complaint filed against Plaintiff on or about December 6, 2024 expressly alleged "discriminatory harassment."

100. OPNAVINST 5354.1H defines "discriminatory harassment" as follows,

> Unwelcome conduct based on race, color, religion, sex (including pregnancy), gender identity, national origin or sexual orientation. Discriminatory harassment occurs when the conduct is severe or pervasive enough to create a work environment that a reasonable person would consider intimidating, hostile or abusive. Discriminatory harassment can be conducted through the use of electronic devices of communications and by other means including social media, as well as in person.

101. MIDN Krause is a white, heterosexual, American male who subscribes to the Muslim faith. As such, MIDN Krause is not a member of a protected class.

20

102. Neither the three colorful, deliberately provocative statements Plaintiff admitted to making nor the same three statements and one additional statement corroborated by MIDN Teske had anything to do with Muslims or the Muslim faith.

103. Of the 24 statements Plaintiff allegedly made according to MIDN Krause's secret "log," three of them concerned the fact that MIDN Krause was Muslim.

104. In his interview on February 21, 2025, MIDN Krause told the PIO that, other than the alleged comments Plaintiff had directed at MIDN Krause directly, the comments targeted no specific individuals within any of the "demographics" other than one referencing the director Martin Scorsese.

105. The statements at issue exclusively occurred within the confines of a single room in Bancroft Hall between Plaintiff and two white, heterosexual American males. Every single member of Plaintiff's chain of command conceded as much. Private, lively, and sometimes heated conversations among roommates confined to a single living space in Bancroft Hall concerning some of the country's most pressing cultural and political issues do not constitute a "work environment," let alone a "hostile work environment."

106. When viewed within the broader context in which they were made, the statements at issue were neither "severe" nor "pervasive."

107. Thus, any separation justification premised on a finding of guilt as to this Major-level offense is null and void; specifically, the commission of three Major-level offenses over the course of a Naval Academy Career or the alleged violation of an improper SEPP-level offense (see Count IV below).

21

## COUNT III
### SEPARATION VOID GIVEN THAT PLAINTIFF'S ALLEGED HARASSMENT AND CONDUCT UNBECOMING WAS LIMITED TO SPEECH PROTECTED BY THE FIRST AMENDMENT TO THE CONSTITUTION.

108. Plaintiff realleges paragraphs 1–107 as if fully set forth here.

109. As Plaintiff himself pointedly stated in his opening statement before the Commandant,

> MIDN Krause and I had many conversations about race, color, religion, sex, sexual orientation, and national origin; but they were just that . . . conversations . . . admittedly difficult conversations; but that was their purpose: difficult conversations meant to challenge and change us both, to open our eyes to new and different perspectives on topics we are sure to see in the Fleet.

110. In *Terminiello v. City of Chicago*, 337 U.S. 1 (1949), the Supreme Court declared that "a function of free speech under our system of government is to invite dispute. It may indeed serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.* at 4.

111. Further, MIDN Teske explained to the PIO that 1) Plaintiff's comments were never made to anyone specifically, were never made in public, and were never intended to be derogatory and 2) Plaintiff's comments regarding gays were mainly expressions about how alternative sexual lifestyles differed from Plaintiff's religious beliefs and that the general spirit of the comments was that being gay was contrary to the Bible and thus Plaintiff could not condone it.

112. As such, each of the statements – expressions of ideas, however facially "offensive" and not calls to action or the targeting of any specific person within any protected class—were protected by the Free Speech Clause of the First Amendment.

113. The Naval Academy's and Navy's punishment of Plaintiff for the mere expression of those ideas violated the First Amendment and renders Plaintiff's separation null, void, and not in accordance with law.

<u>**COUNT IV**</u>
**SEPARATION VOID GIVEN THE IMPROPER AND DUPLICATIVE NATURE OF THE 04.21 CHARGE AND ITS ELEVATION TO A SEPP-LEVEL OFFENSE.**

114.  Plaintiff realleges paragraphs 1–113 as if fully set forth here.

115.  At the outset of the CMEO investigation commencing no later than December 10, 2024, Plaintiff was notified of one potential conduct charge: 04.10, "Harassment of a non-sexual nature as defined in current SECNAV, OPNAV, and USNA Instructions."

116.  A "Note" in the Conduct Manual below these charges defines "Harassment" in language taken directly from OPNAVINST 5354.1H.

117.  It was not until Plaintiff appeared before the Deputy Commandant that he learned of additional conduct charges leveled against him, including two permutations of charge 04.21.

118.  The Conduct Manual lists two types of 04.21 violations. The first is "Violation of UCMJ," which carries a "SEPP" offense level. The second is "Violation of Navy Regulations, SECNAV and OPNAV Instructions, General Orders, federal, state, or local laws," which carries a "Major" offense level.

119.  A "Note" below the two 04.21 charges in the Conduct Manual states, "Specify the law or regulation which was violated. ***If the offense is specifically described by another offense code, that offense code should be used.***"

120.  The Academy ignored that directive and improperly charged Plaintiff with a violation of Article 92 of the UCMJ in order to upcharge Plaintiff and elevate the offense level.

121.  Indeed, pursuant to the Conduct Manual directive, the *only* violation with which Plaintiff should have been charged was a violation of 04.10, "Harassment of a non-sexual nature as defined in current SECNAV, OPNAV, and USNA Instructions."

122.  The only harassment-related charge of which Plaintiff was given notice was, ironically, the 04.10 charge, which Plaintiff acknowledged on or about December 12. This notice violation is further discussed in Count VI below.

123.  The double charging of Plaintiff with the 04.10 and 04.21 charges, exacerbated by the use of the wrong, inapplicable 04.21 charge, was impermissible and unlawful.

124.  Nor could the Naval Academy have elevated the "Violation of . . . OPNAV Instructions" version of the 04.21 offense or the original 04.10 charge to a SEPP-level offense, even if the administrative record provided such justification (and it does not.)

125.  No such justification would have withstood judicial scrutiny. The Conduct Manual provides, in Section 2.1.c.,

> When midshipmen commit multiple offenses, or repeat offenses, either the reporting midshipman or the conduct officer may elevate the level of the offense either one or two levels. For example, the second offense of 05.01 (irresponsible drinking) may be entered as a Major (even though the first offense is a Minor). On the third offense, it may be entered as a SEPP.

126.  Plaintiff had never previously been found guilty of, let alone charged with, a violation of OPNAVINST 5354.1H.

127.  The guilty findings in Plaintiff's case with respect to these 04.21 charges were procedurally and substantively improper, undercutting the grounds for the entire unsatisfactory conduct proceeding.

128.  Accordingly, the separation and discharge of Plaintiff from the Naval Academy and the Naval Service must be set aside as void, invalid, arbitrary and capricious, unsupported by substantial evidence, and/or contrary to statute and regulation, mandatory published procedure, or DON practice.

129.  This Court has the authority to review these actions under 5 U.S.C. § 702 and to enjoin and overturn them in accordance with 5 U.S.C. § 706(2)(A) and (B).

130.  The agency violations and actions at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the relief requested, there exists no adequate remedy at law.

**<u>COUNT V</u>**
**SEPARATION VOID GIVEN THE NAVAL ACADEMY'S MULTIPLE VIOLATIONS OF THE CMEO INSTRUCTION, THE VERY INSTRUCTION, THE VIOLATION OF WHICH, SERVED AS ITS PRIMARY BASIS FOR SEPARATING PLAINTIFF.**

131.  Plaintiff realleges paragraphs 1–130 as if fully set forth here.

132.  The CMEO complaint from MIDN Krause completed on or about December 10, 2024, NAVPERS 5354/2 (Rev. 02-2024), under the subheading "Complainant Information," states,

> I understand that a formal complaint shall be made within 60 calendar days of the offending incident, or in the case of a series of incidents, within 60 calendar days of the most recent incident.

133.  MIDN Krause signed this acknowledgement despite the fact that the "most recent incident" had occurred at least ***seven months*** prior to the filing of the complaint.

134.  In his interview on February 21, 2025, MIDN Krause made clear to the PIO that, since parting as roommates, he and Plaintiff had had "limited interactions which have been respectful." There is thus no evidence that any of the statements about which MIDN Krause was complaining occurred after mid-May 2024.

135.  Although the CMEO Instruction provides that "Commanders may accept complaints beyond this time frame if, in their judgment, circumstances warrant," there exists nothing in the administrative record documenting why the Deputy Commandant determined that circumstances warranted a seven-month delay in reporting.

136.  Section 5.g.(8) of the CMEO Instruction provides that, to the extent practicable, the investigation should be completed within thirty (30) days. The section further provides that if, due to extenuating circumstances, it becomes impossible to conduct a complete investigation within 30 days, the commander may obtain extension in writing from the next higher commander for usually not more than 30 days and that, upon receipt of the extension, the commander must inform the complainant and alleged offender of the extension, its duration and the reasons for which it was requested.

137.  Section 5.g.(10) of the CMEO Instruction provides that after a final determination, the commander must debrief the alleged offender. The alleged offender must be notified of the results once the complaint has been resolved and informed of his right to appeal the decision, all of which must be documented on the NAVPERS 5354/2.

138.  The NAVPERS 5354/2 signed by the Deputy Commandant on or about March 13, 2025 bears no signature of Plaintiff's acknowledgement of the final determination of the CMEO investigation and no indication as to whether Plaintiff intended or did not intend to appeal. A copy of this NAVPERS 5354/2 is attached as **Exhibit A**.

139.  The investigation of MIDN Krause's CMEO complaint began no later than December 10, 2024. It was not completed until March 3, 2025. Neither the Deputy Commandant, the Commandant, nor the Superintendent ever sought an extension from the next highest commander, and Plaintiff was never advised of any extension, let alone of any justification for such an extension.

140.  The CMEO Instruction sets forth specific procedures for the handling of an informal complaint, the most important of which is the requirement that the Command Climate Specialist ("CCS") or the CMEO program manager use an informal resolution system in an effort to resolve

the complaint. The Instruction further provides that the CCS or CMEO program manager shall have 30 days to complete that informal resolution process.

141.   The Instruction further notes that "At any time the *complainant* can stop this process and submit a formal complaint. In this case, however, the Deputy Commandant stopped the process and instantly converted the informal complaint into a formal one, improperly bypassing one of the CMEO Instruction's most important policy mandates: *resolving conflict at the lowest possible level*.

142.   The Student Guide for the Command Managed Equal Opportunity Manager's Course (CMEO) (the "Student Guide") provides important - indeed critical - guidance directly relevant to the dispute that arose between Plaintiff and MIDN Krause, guidance not found in OPNAVINST 5354.1G.

143.   The first substantive page of the Student Guide, *Understanding the Command Managed Equal Opportunity Program,* provides that "[t]he Navy has a variety of resources available to Sailors filing or handling both informal and formal complaints in response to unprofessional behavior. **The Informal Resolution System (IRS) is the *recommended first step* in conflict resolution."** The "Introduction" to Topic 4-1 in the Student Guide could not be more clear as to why the IRS is the recommended first step:

> Resolving conflict is a fundamental leadership responsibility. Unresolved conflict is not only contrary to good order and discipline but it also erodes unit cohesiveness and destroys morale.

144.   The Deputy Commandant, and indeed the Command itself, chose to abandon the leadership responsibilities demanded by the CMEO process and substituted knee-jerk, procedurally improper discipline in its place.

145.  Accordingly, the separation and discharge of Plaintiff from the Naval Academy and the Naval Service must be set aside as void, invalid, arbitrary and capricious, unsupported by substantial evidence, and/or contrary to statute and regulation, mandatory published procedure, or DON practice.

146.  This Court has the authority to review these actions under 5 U.S.C. § 702 and to enjoin and overturn them in accordance with 5 U.S.C. § 706(2)(A) and (B).

147.  The agency violations and actions at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the relief requested, there exists no adequate remedy at law.

**COUNT VI**
**SEPARATION VOID GIVEN THE NAVAL ACADEMY'S MULTIPLE VIOLATIONS OF THE CONDUCT MANUAL, INCLUDING VIOLATIONS OF PROCEDURAL DUE PROCESS GUARANTEED BY THE FIFTH AMENDMENT TO THE CONSTITUTION**

148.  Plaintiff realleges paragraphs 1–147 as if fully set forth here.

149.  Section 3.1.d.(4) of the Conduct Manual states that a PIO's investigation should normally be completed within five working days of assignment. It further provides that if an investigation requires an extension of that time period, the PIO must notify the Deputy Commandant, the Commandant's Conduct Officer, their respective Battalion Officer, and the Battalion Officer of the accused via email and request an extension.

150.  The investigation of the CMEO complaint took more than three months.

151.  The investigation of the sex-in-the-Hall charge took seven weeks.

152.  The administrative record is devoid of any evidence that any PIO associated with those investigations ever obtained an extension from anyone.

153.  The Conduct Manual mandates that, prior to making any statement, a midshipman must be presented with each and every one of the conduct charges against him and must execute a Suspect's Rights Acknowledgement/Statement, a requirement also required by Section 0176 of the Manual of the Judge Advocate General ("JAGMAN"), which is intended to provide the midshipman with fair notice of the charges against him and further to advise him of his due process rights, which include the right to remain silent (as required by Article 31(b) of the UCMJ) and the right to consult with counsel prior to making any statement.

154.  The Conduct Manual further mandates that the Commandant of Midshipmen's Conduct Officer that all such Suspect's Rights Acknowledgement/Statement forms as to each and every charge are a part of the conduct package submitted to the Deputy Commandant for his review prior to his formal adjudication of the charges.

155.  On or about March 13, 2025, the Deputy Commandant indicated on page 7 of 9 of MIDN Krause's formal CMEO complaint (NAVPERS 5354/2), that, in addition to the 04.10 charge of which Plaintiff had previously been given notice on December 12, 2024, the Deputy Commandant intended to refer the following additional charges to be investigated: a) 02.09 Failure to Use Good Judgment (Minor), b) 04.21 Violation of the Uniform Code of Military Justice, Article 92, Failure to Obey and Order or Regulation (SEPP), c) 04.21 Violation of Navy Regulations, SECNAV and OPNAV Instructions, General Orders, federal, state, or local laws (Major), and d) 04.23 Conduct unbecoming a midshipman with no external (no non-USNA) awareness (Major).

156.  Petitioner was never given notice of these additional charges, nor was he advised of his rights with respect to each. The first time he became aware of them was at the Deputy Commandant's adjudication of the charges on May 7, 2025. Thus, Plaintiff had no fair notice of

those charges and was never advised of his rights to remain silent and consult with counsel with respect to each.

157. Nor was Plaintiff provided with a copy of the PIR dated April 15, 2025 prior to his adjudication before the Deputy Commandant on May 7, 2025, in further violation of Section 4.2g.(3) of the Conduct Manual. And with respect to the documents he was shown the evening before that adjudication, that notice occurred less than 24 hours before the adjudication itself, in violation of Sections 1.8.c. and 4.2.f. of the Conduct Manual.

158. These errors and omissions constituted gross violations of Plaintiff's procedural due process rights under the Conduct Manual, the JAGMAN, the UCMJ, and the Fifth Amendment to the U.S. Constitution and made it impossible for Plaintiff to defend himself.

159. On May 6, 2025, the day before Plaintiff's adjudication before the Deputy Commandant, Plaintiff's conduct record in MIDS still did not reflect the two 04.21 violations (Violation of UCMJ Article 92 and Violation of an OPNAV instruction) or 04.23 (Conduct Unbecoming) charges.

160. On December 8, 2025, four months after the Superintendent recommended Plaintiff's disenrollment from the Naval Academy and discharge from the Naval Service, Plaintiff's conduct record in MIDS still did not reflect the 04.21 violations (Violation of UCMJ and Violation of an OPNAV instruction) or 04.23 (Conduct Unbecoming) charges.

161. It was improper to assign both the administrative conduct phase of the CMEO investigation and the sex-in-the-Hall investigation to the same PIO.

162. That assignment resulted in further unjustified delays of the adjudication of the CMEO charges and the conflation of those charges and the sex-in-the-Hall charges into single adjudications before the Deputy Commandant and the Commandant. Such conflation both violated

30

the Conduct Manual and severely prejudiced Plaintiff by portraying Plaintiff as a serial conduct offender.

163. Accordingly, the separation and discharge of Plaintiff from the Naval Academy and the Naval Service must be set aside as void, invalid, arbitrary and capricious, unsupported by substantial evidence, and/or contrary to statute and regulation, mandatory published procedure, or DON practice.

164. This Court has the authority to review these actions under 5 U.S.C. § 702 and to enjoin and overturn them in accordance with 5 U.S.C. § 706(2)(A) and (B).

165. The agency violations and actions at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable. Other than the relief requested, there exists no adequate remedy at law.

## COUNT VII
**SEPARATION VOID GIVEN AN ADJUDICATIVE PROCESS TAINTED BY RACIAL ANIMUS, DISCRIMINATION, AND BIAS.**

166. Plaintiff realleges paragraphs 1–165 as if fully set forth here.

167. During Plaintiff's adjudication before the Commandant of Midshipmen on May 20, 2025, the Brigade Master Chief ("BMC"), asked Plaintiff where he was from.

168. When Plaintiff replied that he was from Texas, the BMC asked Plaintiff if he had ever heard of Jasper, Texas. When Plaintiff said that he had not, the BMC suggested that Plaintiff "look it up."

169. As acknowledged by the Command in its notes of the Commandant's adjudication, the BMC was referring to the murder of James Byrd, Jr. in 1998, who was chained to the back of a pickup truck and dragged to death in Jasper, Texas.

170.  There was no reasonable or rational basis for the BMC's invocation of the death of James Byrd, Jr. in the course of the adjudication. Even when cast in the most favorable light possible, the BMC declared in front of those assembled, including the Commandant, that Plaintiff was as much of a racist as the three white men who had dragged James Byrd, Jr. to his death. The comment was a blatant display of racial animus, discrimination, and bias that irreparably tainted the proceedings.

171.  That racial animus, discrimination, and bias was further evidenced by the BMC's comment at the adjudication that Plaintiff's efforts to self-remediate in consultation with two faculty members only proved that Plaintiff was guilty, a violation of any servicemember's fundamental right to defend him or herself.

172.  Accordingly, the separation and discharge of Plaintiff from the Naval Academy and the Naval Service must be set aside as void, invalid, arbitrary and capricious, unsupported by substantial evidence, and/or contrary to statute and regulation, mandatory published procedure, or DON practice.

## <u>COUNT VIII</u>
### SEPARATION VOID AS ARBITRARY AND CAPRICIOUS UNDER THE ADMINISTRATIVE PROCEDURE ACT BECAUSE NEITHER THE SUPERINTENDENT NOR THE ASN(M&RA) GAVE ANY STATUTORILY COGNIZABLE REASONS OR BASES FOR THE FINAL AGENCY ACTION AT ISSUE HERE.

173.  Plaintiff realleges paragraphs 1–172 as if fully set forth here.

174.  It is black letter law that an administrative agency of the federal government that fails to provide reasons or bases for its final agency action is arbitrary and capricious under the APA.

175.  To trigger processing for unsatisfactory conduct under 10 U.S.C. § 8462, a midshipman must be placed in an unsatisfactory conduct status as a result of determinations of guilt

in distinct kinds and numbers of offenses, a violation of probation, or an accumulation of demerits that exceeds semester, year, or career limits.

176.  Although the Superintendent's Memorandum Report lists three references, it does not cite specifically to any of them; accordingly, within its four corners, the Report does not identify the authority it relies upon as the basis for its recommendation. The Superintendent also does not cite any of the statutory bases for disenrolling a midshipman from the Naval Academy, *see, e.g.,* 10 U.S.C. §§ 8461–63.

177.  Neither the Superintendent's Memorandum Report nor the Memorandum of the ASN(M&RA) provided any reasons or bases for Plaintiff's separation conforming to the specific criteria for an express determination by the Superintendent that the conduct of Plaintiff was unsatisfactory, nor was there any finding by ASN(M&RA) that such determination was "reasonable and well founded," or that Plaintiff was unsuited to fulfill his service obligation through enlisted service, all of which is required under the Disenrollment Procedures Instruction.

178.  This Court has the authority to review these actions under 5 U.S.C. § 702 and to enjoin and overturn them in accordance with 5 U.S.C. § 706(2)(A) and (B).

179.  The agency violations and actions at issue here are final because the harm to Plaintiff caused by these violations and actions is immediate, continuing, and irreparable.  Other than the relief requested, there exists no adequate remedy at law.

**COUNT IX**
**DEFENDANT SUPERINTENDENT UNLAWFULLY REQUIRED PLAINTIFF TO REQUEST LEAVE PENDING SEPARATION AND TO WAIVE HIS ENTITLEMENT TO PAY AND ALLOWANCES, UNLAWFULLY DEPRIVING HIM OF RATIONS, QUARTERS, AND PAY.**

180.  Plaintiff realleges and incorporates paragraphs 1-179 as if fully set forth here.

33

181. A Naval Academy midshipman is entitled to monthly pay at the rate of thirty-five percent (35%) of the basic pay of a commissioned officer in the pay grade of O1 with less than two years of service. While at the Naval Academy, Plaintiff received monthly five-hundred dollars ($500.00), a fraction of the one-thousand, four-hundred, fifty dollars ($1,450.00) he was entitled to per month.

182. A Naval Academy midshipman is also entitled to a daily ration, including on each day that he is on leave, and to the monetary value of the daily ration ("commuted rations") for each day that a ration is not provided.

183. A Naval Academy midshipman is also entitled to all allowances provided by law and to board at the Naval Academy at no cost.

184. Federal law authorizes the Superintendent of an Academy midshipman on involuntary leave without pay for any period during which the Superintendent has suspended the midshipman from duty and the midshipman is pending separation from the Academy.

185. Plaintiff was not suspended from duty by the Superintendent, and no evidence of record exists which is reasonably adequate to support any conclusion to the contrary.

186. Implementing regulations provide that a midshipman may *request* to be placed in a leave/pending separation status but impose no requirement that any such request be made.

187. Plaintiff's request to be placed on leave pending separation and his waiver of pay and allowances were involuntary and legally void because they were made under duress, arising from the order to execute the Leave Request he received from a higher-ranking official in the Midshipman Personnel Office ("MIDPERS"), and from the impression created by medical providers and members of his chain of command that he needed to execute the request and waiver in order to receive timely medical care.

34

188.  Plaintiff's waiver of pay and allowances, in addition to being involuntary, was also neither knowing nor intelligent, because it was executed on the basis of erroneous information and a completely false and inadequate understanding of the consequences and implications, and because the form Plaintiff signed erroneously represented the waiver of pay and allowances as *required* consideration for the "privilege" of being granted leave.

189.  Because Plaintiff's request for leave pending separation was made under duress and was therefore involuntary, judgment should issue for Plaintiff declaring his request for leave contrary to law and void, and declaring him entitled to receive quarters and rations at USNA.

190.  Because Plaintiff's waiver of pay and allowances for leave pending separation was made under duress and therefore involuntary and was also neither knowing nor intelligent, judgment should issue for Plaintiff declaring his waiver of pay and allowances contrary to law and void, and declaring him entitled to pay and commuted rations.

191.  Because Plaintiff has a clear right to quarters, rations, pay and allowances, judgment should also issue against Defendant United States declaring the placement of Plaintiff on involuntary leave as contrary to law and Plaintiff's quarters, rations, pay, and allowances as unlawfully withheld, and requiring Defendant to return Plaintiff to the Academy, to provide him with rations, to re-start his pay and allowances, and to return to Plaintiff all arrears of pay and allowances found to be due upon correction and auditing of his pay account.

## COUNT X
**Defendant's Determination That Plaintiff Has a Debt Owing the United States Is Legally Insufficient and Unenforceable, Rendering Collection Action Thereupon Unlawful.**

192.  Plaintiff realleges paragraphs 1–191 as if fully set forth here.

193. SECDEF regulations require SECNAV and DFAS to have established uniform accounting procedures for determining the cost of education at the Naval Academy and provide for a standard method for computing reimbursement of that cost.

194. Those regulations also require SECNAV to have prescribed repayment procedures that provide for clearly explaining in writing to an alleged debtor the basis for the total amount alleged to be due arising from a Naval Academy education, monthly repayment schedules, the repayment method, and other relevant information.

195. Regulations additionally provide that for a debt to be established an agency official must make a proper determination that an amount is owed the United States.

196. The allegation of the fact and amount of Plaintiff's indebtedness is not based on the use of the procedures mandated by SECDEF, nor does the record reflect that such procedures have been developed and implemented, and no evidence of record exists which is reasonably adequate to support any conclusion to the contrary.

197. Furthermore, Plaintiff received no notice based upon any SECNAV-established procedures adequately explaining either the basis for the fact and amount of the alleged indebtedness or the other required information, and no evidence of record exists which is reasonably adequate to support any conclusion to the contrary.

198. Likewise, the evidence of record does not reflect an express, proper determination by an agency official with respect to any amount owed by Plaintiff to the United States.

199. Instead, the evidence of record that does exist with respect to the fact and amount of the alleged debt is limited to a conclusory order from ASN directing "monetary recoupment in the amount of $179,459.06," an equally conclusory and unsubstantiated assertion by the MIDPERS that "MEMEBER HAS AN OUTSTANDING MONETARY COMMITMENT," and an

abbreviated, unattributed, and only marginally decipherable note in a statement from a DFAS official that reads, "DEBT IS FOR (NROTC) EDUCATION TUITION ASSISTANCE: DISENROLLMENT DATE 12/5/2025"

200. Plaintiff was never in the Naval Reserve Officers Training Corps and never received tuition assistance in connection with any such participation.

201. Insofar as the record is devoid of substantial evidence reflecting the determination of or adequate notice to Plaintiff regarding the alleged debt based upon procedures developed and implemented by SECNAV pursuant to the requirement of SECDEF's regulations, and insofar as the evidence of record that does exist is either conclusory or wholly inaccurate and contrary to the established facts of record, MIDPERS's determination of the fact and amount of Plaintiff's alleged indebtedness to the United States must be set aside as arbitrary and capricious, unsupported by substantial evidence, and void, the alleged debt must be set aside as legally unenforceable and collection thereupon set aside as unlawful.

202. Regulations having the force and effect of law provide that a legally enforceable debt is a debt established by a final agency determination that the alleged debt is valid and due in the amount stated.

203. Regulations having the force and effect of law also provide that incident to establishment of a debt, the DCO, in this case, USNA, is required to comply with all due-process requirements. These requirements implement the due-process requirement of the Fifth Amendment to the United States Constitution and provide that a debtor must be notified of the alleged reason, authority, and basis for the allegation of indebtedness and the due-process rights available to the debtor.

204.  Implicit in the due-process rights afforded the debtor is the opportunity meaningfully to exercise those rights, and the right to a final determination on the basis of the due-process afforded,

205.  Regulations having the force and effect of law also expressly provide that almost immediately upon establishment of an alleged debt, the DCO must issue a debt notification letter that meets all the notice requirements of the FMR and Treasury's MFR Appendix 8, Exhibit N, at 1–2.

206.  Plaintiff has never been provided with a *proper* debt notification letter.

207.  For want of the debt notification letter, Plaintiff has been deprived of notice as to: the reason, authority, and basis for her alleged indebtedness; the properly established due date for its payment, which by regulation arises from a proper debt notification letter, the name, email address, and telephone number of a point of contact within the DCO; his right to submit a written request for a review of the alleged debt and his right to present evidence in support of any challenge to the alleged debt he might wish to make ; his right to receive a written decision reflecting the outcome of the review; and his right to inspect and copy records relating to the debt.

208.  Regulations having the force and effect of law also provide that an agency should respond to a communication from an alleged debtor within 30 days and advise an alleged debtor disputing the existence of a debt that he should furnish available evidence to support his contentions with respect to the dispute.

209.  Defendant's failure to provide Plaintiff the required notice directly deprived him of the opportunity and ability to exercise his right to inspect records related to his alleged indebtedness; submit evidence rebutting its existence; petition for review of the validity, basis, or amount of the debt; obtain the first-instance agency review of the existence, validity, basis,

38

authority for, and enforceability of the alleged debt to which the federal Constitution, statute, and regulation entitle him; and receive a judicially reviewable final agency determination on the validity and legal enforceability of the debt.

210. Defendant's failures deprive the alleged debt of finality and validity and render it legally unenforceable.

211. For want of due process, the determination that Plaintiff owes a debt to the United States must be set aside as arbitrary and capricious, unsupported by substantial evidence, contrary to law, regulation, and mandatory published procedure, and void, the alleged debt must be set aside as legally unenforceable, any attempted collection thereupon declared an illegal exaction, and monies exacted in connection therewith refunded.

## COUNT XI
### Defendant's Referral of the Alleged Dept to DCMO and Treasury for Collection Services Was Contrary to Law and Regulation, Rendering Collection Action Equally Unlawful.

212. Plaintiff realleges paragraphs 1-211 as if fully set forth here.

213. Regulations having the force and effect of law provide that, prior to referral of an alleged debt to the DCMO and Treasury for collection, the DCO must afford an alleged debtor all due process, to include a proper debt notification letter and internal review procedures.

214. Federal law and implementing regulations having the force and effect of law also provide that only legally enforceable, delinquent debts are ripe for referral to DCMO and Treasury.

215. Regulations having the force and effect of law equally provide that prior to referral of an alleged debt to Treasury for cross-servicing, the referring agency must certify that the debt is 1) delinquent, 2) legally enforceable, and 3) based upon agency compliance with all due-process requirements arising under federal law and agency regulations.

216.  The Treasury's MFR expressly provides that Treasury will accept a debt for collections action only if the debt is legally enforceable based upon a final agency action that has determined the debt to be valid.

217.  The record is unequivocal that Petitioner was absolutely deprived of the due-process to which he is entitled by federal law and regulation and the Treasury's MFR, and no evidence of record exists which is reasonably adequate to support any conclusion to the contrary.

218.  Moreover, the debt referred by the DCO to DCMO for collection was not delinquent at the time it was referred, and cannot now be so considered insofar as no payment due date has been established by means of a proper debt notification letter.

219.  In addition, no DCMO or DCO certification was made upon referral of the alleged debt to Treasury as to the debt's delinquency or legal enforceability, nor was any certification made as to the DCO's or DCMO's compliance with due-process requirements, no evidence of record exists which is reasonably adequate to support any conclusion to the contrary, and any evidence that may be produced in support of any contrary conclusion will be contradicted by the facts of record.

220.  The certification that DCO did provide to DCMO, moreover, is factually incorrect insofar as it improperly asserts that the debt is valid and legally enforceable and delinquent. Because Petitioner was not afforded the notice and right to respond that due process requires, the debt cannot be held as valid and enforceable, nor can it be deemed delinquent for way of a due date established by a proper notification letter. Moreover, DCO positively omitted the required due-process compliance certification despite the required language of the template provided by regulations.

221. Insofar as the record is absolutely devoid of substantial evidence reflecting that the conditions precedent to referral of the alleged debt to DCMO and Treasury were met, its purported establishment with Treasury for collection must be set aside as arbitrary and capricious, unsupported by substantial evidence, contrary to law, regulation, and mandatory published procedure, void and legal unenforceable, collection thereupon found to be an illegal exaction, and monies exacted therewith refunded.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to 28 U.S.C. § 1491(a)(2), the Plaintiff prays this honorable Court to enter judgment against Defendant and award the following relief:

1. Reinstatement to active duty and constructive service credit with accrued leave for the period December 17, 2025 to the date of reinstatement.

2. Correction of Plaintiff's record to remove, correct, or completely expunge any material or entries inconsistent with the Court's grant of relief.

3. Back payment of all regular and special pay, allowances, allotments, compensation, emoluments, or other pecuniary benefits due, to include reimbursement of expenses that would not otherwise have been incurred but for the errors in the record herein detailed, and accruing: 1) from December 5, 2025 to the date of reinstatement at the Midshipman First Class pay grade. This demand for judgment exceeds ten thousand dollars ($10,000.00).

4. Refund of any amount recouped.

5. All other due and proper relief, incident of and collateral to the Court's judgment, so as to provide an entire remedy and to complete the relief afforded by that judgment, pursuant to 28 U.S.C. § 1491(a)(2).

41

Dated: May 28, 2026        Respectfully submitted,

Jeffrey E. McFadden
LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD 21638
(443) 272-4737
office-info@jmcfaddenlaw.com

*Counsel for Plaintiff*

42